The following opinion was delivered at Special Term:
Sedgwick, J.
The court of appeals has decided in this case (46 If. T. 143), that the deed, made by the plaintiff to' the defendant is void. The plaintiff is therefore entitled to judgment in its favor, unless the defendant establishes, that.notwithstanding the plaintiff’s title, the defendant has a right to the possession of the premises.
One of the defences made to maintain the defendant’s right to possession is, that the defendant is in possession as assignee of certain mortgages upon the property. I will assume that a legal mortgagee, as such, can only gain rightful possession under the mort *378 gage, after forfeiture, and with the consent of the mortgagor. I also assume that a mortgage does not for any purpose transfer to the mortgagee any title to or interest in the land mortgaged, and that a mortgage is but a pledge and security, always redeemable until foreclosure (Kortright v. Cady, 21 N. Y. 364). In that case, Judge Comstock said, “ The mortgagee’s right to bring ejectment, or being in possession to defend himself against an ejectment by the mortgagor, is but a right to recover, or to retain the possession of the pledge, for the purpose of paying the debt (6 Conn. 163). Such a right is but the incident of the debt, and has no relation to a title or estate in the land. Any contract for the possession of land, however transient or limited, will carry the right to recover that possession, and such was deemed to be the nature and construction of a mortgage, it being considered that the parties intended that the possession of the thing hypothecated should go with the contract.” This was said, after noticing the fact that the Revised Statutes had taken from the mortgagee the right to bring an action of ejectment against the mortgagor.
The summons and complaint in this action were served July 30, 1863. The defendant served an amended answer May 25, 1864. This claimed that on May 2, 1863, the defendant became an assignee of a bond and mortgage for twelve thousand five hundred dollars on this property, made by the plaintiff, and payable February 1, 1864, with an agreement, that in default of payment of interest for thirty days, the principal should become due; that there had been default in the interest due August 1, 1863, and ever since thereafter, and that the principal sum was wholly due. These averments were proved. In this way it appears that before the bringing of the action, the defendant became entitled to the rights of the mortgagee in this mortgage, and that before this answer was served, the principal sum *379 had become due both by default in payment of interest, and by the time agreed on for its final payment having passed. . There was, therefore, a forfeiture under this mortgage.
By a supplemental answer, served May 26, 1864-, the defendant alleged, as was proven, that on October 17, 1863, it became assignee of a bond and mortgage, made by the plaintiff, on this real estate, for thirty thousand dollars, with the same terms and conditions that were provided by the mortgage of twelve thousand five hundred dollars ; that the interest had not been paid since February 1, 1863, and that the principal sum, payable February 1, 1864, had not been paid. The defendant claimed to hold possession under this mortgage, under which there had been the forfeiture described.
If these matters so pleaded do establish a right of possession in the defendant, acquired after the action was begun, they may properly be pleaded, although the action is one of ejectment (Jackson v. McCall, 3 Cowen, 79, citing Jackson v. Rich, 7 Johns. 194; Jackson v. Dumont, 8 Id. 60; Jackson v. McConnell, 11 Id. 424 ; Jackson v. Bell, 19 Id. 168); and on their being sustained by proof, the judgment would be, if there were no other facts in the case, that the plaintiff should not further maintain this action.
As we have seen, there was, after the action was brought, a forfeiture, so called, under each of the mortgages. Was the possession of the defendant held under the mortgages by the consent of the plaintiff ? What is meant by consent, is not defined in the cases in which it is used. It seems to have been first used after the Revised Statutes had deprived the mortgagee of the right to bring an action of ejectment under the mortgage. In referring to that provision, and having in mind what would be the case ordinarily, that the mortgagor would be in possession, it was said, that notwithstanding the statute, the mortgagee could take *380 possession by consent of the mortgagor, and defend such possession. It is not said that the consent must be an express one given by the mortgagor outside of the mortgage. In Phyfe v. Riley (15 Wend. 248), Chief Justice Savage said, in regard to this provision of the Revised Statutes, that if the mortgagee, after forfeiture, obtain possession in some legal mode other than by action, why should the mortgagor recover possession without paying the mortgage. From the nature and construction of a mortgage, it being considered that the parties intended that possession “should go with the contract” (Kortright v. Cady, supra), it must be that the consent referred to is presumed from the transaction itself. There may be an agreement, which will modify this presumption. But in this case there is none such; nor do the circumstances of the case show that the plaintiff intended that the defendant should not take or keep possession under the mortgage. At the time this action began, there had been no forfeiture. By giving the mortgage, the plaintiff had consented that the mortgagee should take possession of the pledge, if he could do so by some mode that was not illegal in itself.' There is no reason in the facts for believing that the plaintiff intended to deprive the assignor of that mortgage of the consent, even if such assignor was the defendant here.
The bringing of the action was not evidence that the plaintiff withheld its consent that possession should be taken under the mortgage. At that time there had been no forfeiture, and the contest between the parties, concerned the deed given by plaintiff, and the rights of the defendant under it. Before the answer was interposed, nothing had been done that affected the point now in view, except giving the mortgage, which was a consent. If the defendant gained possession under this consent, while such was the *381 state of the case, the plaintiff cannot withdraw that consent, after the right of possession had become vested.
It is argued that, inasmuch as the defendant was a trespasser when it became assignee of the mortgage, it cannot^urn this possession, tortious against the plaintiff, into a legal and valid one, for the purpose of a defense. If the defendant attempted to gain any right by means of a trespass, it would be unsuccessful. If it gained anything here, it was only by plaintiff’s consent. There would be no doubt, if the defendant was confessedly a trespasser, and after its becoming mortgagee, the plaintiff should consent expressly in words, that possession might be kept under this mortgage, that the plaintiff could not recover possession without offering to pay the mortgage. Yet if we are right, the defendant has had in the mortgage itself, a consent as valid and efficacious as would be made by words. I therefore think that the possession of the defendant as mortgagee, was by the consent of the plaintiff.
The conclusion so far is, that the defendant, notwithstanding the plaintiff’s title, is entitled to the possession of the land, and that this is a defense at law to the further maintainance of the action, since the time the first amended answer was put in. If the matter were to rest here, it would be necessary to examine if the plaintiff was not entitled to costs and damages, down to the time of this answer.
But the defendant further defends by averring in the answer “ that if it be not adjudged, that the sale and conveyance aforesaid is valid and sufficient to invest the defendant with the legal title to said land and church property on Madison avenue aforesaid, the said defendants' have nevertheless paid, done, performed and received performance, in all things herein-before alleged in good faith, and in reliance upon *382 possession of said land and church edifice, and that any attempt to disturb such possession is in bad faith, in violation of the equitable right of the defendant to hold such possession and to be confirmed therein, and that defendants are advised and believe and therefore insist, that in no event, unless and until the plaintiff shall, and do, reimburse defendant’s corporation for all moneys by them paid, and make a just and equitable compensation for the loss which they will sustain by being deprived of such possession, and .... they should be restrained from doing any act, or instituting any proceeding to disturb such possession or recover the same.”
In substance this claim is, that the defendant has an equitable lien on the land which the plaintiff is equitably bound to discharge, based upon payments of various kinds, made for the benefit of the plaintiff. I refer to this matter now, in order to state it in connection with the demand made by the plaintiff in its supplemental complaint. I will not, iu this opinion, look at all, to see if this claim of defendant is a defence to an action at law, or makes an independent equitable cause of action here.
The amended answer also demanded judgment, among other things, “that the defendants have judgment of foreclosure upon the mortgage held by them, and hereinbefore described, in case it shall be determined that the defendants are not entitled to the possession of the premises described in the complaint other than as mortgagee in possession.”
The supplemental answer had a like demand in respect of the mortgage set forth in it.
It is unnecessary to determine the effect of this demand for a foreclosure in view of the nature of the supplemental complaint in this action. It contains the following, viz.: “ Wherefore, in the event of its being determined that the defendants are entitled to a judg *383 inent of foreclosure and sale upon said mortgages, or that they are entitled to retain possession of said premises until they are paid the amount due on said mortgage, or ... . until they are repaid the amount paid by them on account of debts and liabilities of the plaintiff, the plaintiff prays that an account may be taken of the rents and profits of said premises received by the defendant, or with which they are properly chargeable ; and that the amount of such rents and profits may be deducted from the amount which shall be found due to the defendants on account of the matters alleged in said amended and supplemental answers, and that the defendant may be adjudged to surrender to the plaintiff the premises, .... upon the payment by the plaintiff, of the balance, if any, which shall be found due to the defendant upon such accounting.”
The conclusion being that the defendant is entitled to possession under the mortgages, the action is turned into one to redeem the land from them. The next inquiry will be, what, if anything, should the plaintiff pay in addition to the mortgages, to redeem the land.
In actions to redeem, equity has required that the complainant, besides the mortgage, should pay bonds, judgments or other debts, when they were charges upon the land, although the mortgagee could not claim possession under them (Price v. Fastnedge, 2 Amb. 685, and the note to that case). Even on foreclosure, the amount of an assessment paid has been tacked to the mortgage, although the mortgage was silent as to such a matter. A fortiori, in an action to redeem, should a similar equity be regarded (Rapelye v. Prince, 4 Hill, 123 ; Eagle Fire Ins. Co. v. Pell, 2 Edw. Ch. 631). In an action to redeem, even simple contract debts have been tacked to the mortgage (Lee v. Stone, 5 Gil. & J. 1). In one case in this State, this has been virtually done on foreclosure, against a corporation, in *384 the absence of contesting creditors (Beekman Fire Ins. Co. v. M. E. Church, 29 Barb. 658).
The deed having been declared by the court of appeals void, it follows, in my opinion, that the plan of union, and every agreement contained in it or connected with it, that had for its object the making of the deed, or which was deemed the consideration of the deed, are also void as contracts or agreements. Neither party to them gains any right under them. The consequences of this fall on both alike. The whole transaction was void and ineffectual, and by presumption of law, known to be so by both parties. These, namely, the plan of union and its contents, may be evidence of what the parties to them declared and did in connection with any legal transaction which, thereupon, the parties were induced to do. It is the same as in case of an oral lease, which, though void under the statute of frauds, may be used as evidence of the contract of the parties, as to the terms for a year’s tenancy, taken by the lessee under it.
Legal rights may result from acts done in pursuance of, and connected with transactions, legally void. In Mouys v. Leake and others (8 T. R. 411), the defendant granted to the plaintiff an annuity or yearly rent charge, issuing and payable out of a rectory and vicarage, áre. By the same deed he covenanted with the plaintiff to pay the annuity. The defendants, at the same time, executed a warrant of attorney to enter up judgment for money borrowed, which was given as a collateral security for the payment of the annuity. Judgment was entered on the warrant, and an execution, fieri facias de bonis ecclesiasticis, issued. A motion was made to show cause why the proceeding should not be set aside. It was claimed that the grant of the annuity or rent charge out of the rectory, was utterly void, under 13 Eliz. c 20. Lord Kenyon held: “Even admitting that everything that was done by the *385 defendant Leake, to charge or affect the living directly, is absolutely void, still the defendant’s argument on this point is not true in its extent, &c. Now in this case, one of the defendants executed a deed by which lie granted an annuity or rent charge, out of certain benefices. This is not malvm in se. There is nothing wrong in such a transaction, except so far as it is prohibited by statute, . . . but a deed that was intended to operate in one way, may operate in another. . . Then why may not this deed that was intended to operate as a rent charge, upon the living, have effect as a personal security against the grantor, containing as it does a covenant to pay the annuity. A deed of feoffment, if there be no livery, may operate as a covenant to stand seized to uses, and so in many other instances.”
In Oneida Bank v. Ontario Bank (21 N. Y. R. 492), the defendant issued post-dated drafts to the payee named in them. The payee gave at the time, value for them. This transaction was forbidden by the Statute, which declared that no banking association should Issue any bill or note, unless payable on demand. These drafts were delivered by the payee to the plaintiff, who discounted them. The court of appeals held that the drafts were void, but nevertheless the payee had a cause of action against the defendant for money he advanced or loaned to it, when he took the drafts. “ Whatever there was of guilt, in the issuing of the drafts, it was the creature of the Statute. There is no rule of ethics, or principle of the common law, against the issue of time obligations by banks or bankers. The offence is therefore precisely of the nature, form, and proportions, which the legislature have declared. By that authority, and that alone, the bank is prohibited from issuing, but not the dealer from receiving, . . . The loans thus far were lawful contracts, and I see no reason why they cannot stand *386 according to their terms and intention, rejecting only the assurances given for the repayment, as simply worthless.” It was further held, that the sale and endorsement by the payee of these drafts, although they were void, had the effect to assign to the plaintiff, the payee’s cause of action against the defendant. Here the result was precisely the same as if the recovery had been upon the void drafts.
In Ryan v. Dox (34 N. Y. 307) the plaintiff owned land subject to a mortgage, under which it was about to be sold. The defendant orally undertook to the plain tiff, to buy in the land on the sale, in his own name, and to convey to the plaintiff, upon payment of a certain sum. Afterward he refused to carry out this agreement. It was in substance held, that the agreement was void, under the statute of frauds, but that the facts made the defendant a trustee ex maleficio in respect of the land for the benefit of the plaintiff. It was said in that case, ‘1 When one of the parties to a contract, void by the statute of frauds, avails himself of its invalidity, but unconscientiously appropriates what he acquired under it, equity will compel restitution, and it constitutes no objection to the claim, that the opposite party may happen to secure the same practical benefits, through the process of restitution which would have resulted from the observance of the void agreement.”
In Williams v. Fitzhugh (37 N. Y. 447), a mortgage had been given to secure several promissory notes. The plaintiff alleged that all these notes were void for usury, and he asked a judgment, declaring them and the mortgage void, and that they be cancelled. The fact was, that not all, but only some of the notes were void for usury. The mortgage was held to be void, altogether, and it was said that the plaintiff could not be prosecuted upon it in any form. Yet as he had come to a court of equity, asking affirmative relief, it *387 would impose upon him as a condition of granting it, that he should pay to the defendants, what, in fact, he had received from them. “In equity, the mortgagor in such cases, stands in reference to debts, not usurious, secured by the mortgage in the same attitude as a complainant seeking to redeem ; he must pay, what in law and equity he owes.”
If the obligation relied on, does not have a vital connection with the void transaction, there does not seem to be an exception to the rule, that it may be enforced, although, as a matter of fact, it was done at the same time as, and with reference to, the void transaction.
To go to the facts of this case, we see that the prohibition of the statute did not extend beyond the sale. So that the prohibition did not extend, as to time, after the delivery of the deed, and the possession taken under it. Up to that point, every thing done to accomplish the forbidden object had no obligation on the parties. Thereafter the parties might make, in reference to the real estate, any other arrangement not forbidden by law. The defendant might then have been ejected. The plaintiff had that right, and by presumption of law so knew. Instead of this, the position taken by the plaintiff, though passive in itself, operated as a request, that the defendant, although not entitled to the fee under the deed, should remain in possession and should do those things which the plan of union had contemplated the plaintiff should do. I think this request is implied in all the circumstances of the situation at that time. The facts are to be looked at exactly as if the defendant, having renounced possession under the deed, re-took it at the request of the plaintiff, the latter knowing that the former meant to go on and make payments of those sums, provided by the plan of union to be paid.
The law will imply from such facts, that the posses *388 sion was to be a security to the defendant, for whatever it might pay for the plaintiff, at its request. Other liens of snch a general character are created by the implication of the law. The vendor’s lien for purchase money is founded on the presumed intention of the parties, although it often happens that they .knew nothing of the rule, and did not expect any such security (Dubois v. Hull, 28 Barb. 28 ; Story Eq. § 1220). A mere deposit of title deeds, without a single word passing, operates as an equitable mortgage. This is the result of several cases as cited by Vice Chancellor Sanford, in Rockwell v. Hobby (2 Sandf. Ch. 13). In that case, he decides that the complainant’s testator having advanced money to the owner of land, and the deed of the land being proved to be in the testator’s possession, the inference was, that the deed had been deposited as security, and it was declared that there was an equitable mortgage. In case of a debt incurred by a married woman, contracted for the direct benefit of her separate estate, although she does not charge it, it would become a lien upon a well founded presumption that the parties so intended, and in analogy to the doctrine of equitable mortgage for purchase money. This is true, although there was an absolute incapacity at common law, of a married woman to make a contract, and in equity she- had the jus dis'ponendi, as to her separate estate (Yale v. Dederer, 22 N. Y. 461).
If such is the true construction of the intention of the parties in this case, the facts would present the chief traits of a vivum vadium, where an estate was granted, to be held until the rents and profits should repay the sum so borrowed (2 Black. Com. 157). In ancient time, no gage or pledge of land was good, unless possession was delivered to the creditor (Id. 159). The request in this case, by the plaintiff to the defendant, was, that the latter should collect the income from the church property, and should pay the *389 debts of the plaintiff, to which a more particular attention will be given hereafter. Such a pledge would be as valid, although no money was at the time paid, as in like case, a legal mortgage to secure future advances. JSTor would it be void by the Statute of Frauds, because there was part performance in giving possession.
This security cannot, however, be applied to the benefit of the defendant, if the plaintiff lacked the power to make it. As the lien does not give to the defendant a title to, or estate in, the land, it is not within the statutory prohibition against selling, except the consent provided, be given. This was held of a legal mortgage, in Manning v. The Moscow Presbyterian Church (27 Barb. S. C. 54).
The powers given to the trustees of a religious corporation over its property, as described by the fourth section of the act of 1813 (3 Edms. St. 690), are to recover, bold and enjoy all the debts, demands, rights and privileges, and all churches, meeting houses, parsonages and burying places, with the appurtenances, and all estates belonging to such churches, conglegation and society, &c., &c., as fully and amply as if the title thereto had originally been vested in said trustees, and also to purchase and hold other real and personal estate ; and to demise, lease and improve the same, &c., and also to repair and alter the said churches or meeting houses, and erect others, if necessary.
At the time this statute was passed, all English Statutes had been, by act of March 30, 1801, § 28, expressly abolished. The first constitution of 1777 had specifically abolished all statutes passed for the advantage or maintainance of any particular religion, which covered all English statutes passed for the protection of the property of the established church. The general policy of former times, was against the acquisition of real property by corporations, for ancient statutes had forbidden it, except by license of *390 the King. The common law favored the alienation of property. The act in question does not seem to have been so carefully framed that, as if in accordance with a policy of moment, its limitations of power should be exact. To sell without leave of'.the chancellor, was definitely forbidden. But they might lease for a term, not limited by the act. And the other powers given are not skillfully chosen, to exclude powers meant to be prohibited. To hold and enjoy and improve real and personal property, and to alter buildings and erect others, seem to imply a possession of dominion over the property, nearly unrestricted. Clearly all this measure of control could not be held in respect to personal property, without a power to dispose of it. The statute, on its face, makes no distinction between the power over real and the power over personal estate, except in the subsequent prohibition against selling without the consent of the chancellor. The case is then of a statute, in which general powers of control or dominion áre given. Taken by itself, this might call for a close and rigid construdtion, on the implication that the statute specifically intended to forbid the exercise of any powers not expressly given. But the statute has ex pressed what it intended specifically to forbid, viz. : sell ing, so that we are thrown back upon giving a liberal construction to the grant of power. The prohibition is precisely of the nature, form and proportions, which the legislature have declared. The law requires, of course, under all circumstances, that whatever the trustees do, shall be done in observance of the trust, and any improper use of a power may be checked.
I infer that the general powers given, imply a power in the plaintiff to give a mortgage, or create alien upon its real estate, of the kind in question. To hold and enjoy and improve real estate, fully and absolutely, require that there should be a power to raise money upon it. It is not meant that their .property should be *391 absolutely inalienable. Such a corporation may sue, and be sued, judgments may go against it, and take its property. This is a consequence of the power to contract debts, which the act does not limit.
The object in the present instance in giving the security, was a proper one. The plaintiff, before taking the proceeding which led to the execution of the deed, had, as averred in its petition to the supreme court, owing to the derangement of business and the finances of the country, by the war then existing, failed to realize from subscription and from the sale of the pews in their church, what they had anticipated, and what had been subscribed and promised, “ and they are therefore unable to pay their liabilities, or meet the current expenses of the church.” In a short time the debts it owed would have turned into judgments, under which its real estate would have been sold. Its dealings with the defendant were likely to result, and have resulted in its retaining the title to the property, to a time when it could both keep the property and pay its debts.
The plaintiff is entitled to redeem the property from the legal mortgages, only upon payment, in addition to the mortgages, of the amounts paid by the defendant upon the security of the real estate, which will be ascertained upon a reference.
This seems to me the proper and legal result, from the acts of the parties to the transaction, hfo doubt this transaction received a different construction at the time. Individuals may have looked at it as a part of an attempted sale, and supposed that the defendant was in possession as owner. This, however, was a mistake of law, and a misunderstanding of the facts. What the individuals intended may have been unlawful, but what the corporations did after all that was void had been passed, was not unlawful.
The order for a reference, that will be made to *392 ascertain what amount, if any, the plaintiff should pay in redeeming the premises, will contain the following directions.
The plaintiff is to be charged with the amounts unpaid upon the legal mortgages held by the defendant.
On the ground that the possession and use of the premises by the defendant, were of a kind consented to by the plaintiff, the defendant should only be charged with mesne profits on the basis of the actual revenue received by it from the church property down to the time of the accounting.
The defendant should be credited with the amounts paid by it in extinguishment of the bonds of five hundred dollars each, secured by the mortgage to Colgate, Darling & Martin, and also with any amounts of subscriptions cancelled by the holder of such bonds delivering them to defendant, and also with the amount of interest paid by the defendant on any of the series of fifty bonds secured by that mortgage.
The defendant should be charged with the amounts paid to it in money on account of subscriptions obtained by plaintiff in plaintiff’s church, for the purpose which I describe in a general way as that of paying floating indebtedness.
The defendant should be credited with the amounts paid by it, in satisfaction of judgments against the plaintiff, and on notes of the plaintiff, or to extinguish the indebtedness of the plaintiff for property sold to it, and on the assessment of two hundred and seventy dollars and forty-eight cents for paving.
The defendant should not be credited with the amounts of the church notes or receipts like those made to Mr. Gumming (Exhibits, numbers twenty and twenty-one), which were surrendered on delivery of deeds for pews. These notes were virtually paid by plaintiff’s property. Nor should it be credited with *393 the amount of the receipts or notes, like those made to Mr. Arnold (Exhibits numbers twenty-two, twenty-three, twenty-four, twenty-five, and twenty-seven), which were also paid by the defendant giving a certificate or deed for a pew, but the defendant is to be credited with the amount of cash paid upon church instalment receipts, like Exhibit number twenty-six.
Addison Brown, attorney, and John E. Burrill, and Ex-Judge Comstock, of counsel for plaintiff, urged :
I. The defendant has no title under the deed. The decision of the court of appeals in this case (46 N. Y. 131) is conclusive.
II. The 43d finding of the justice that the de *394 fendant, after Sept. 1, 1863, held possession (i. e. rightfully) under the mortgages, is erroneous ; for the consent of the plaintiff thereto, or to entry after forfeiture, was a necessary condition, and neither existed here. (1) The cases are uniform that mortgagees can acquire no right to the possession except by consent, after forfeiture, or by legal proceedings ; and so Justice Sedgwick assumes the law to be. But he finds this consent in the nature and terms of the mortgage “as valid and efficacious as would be made by words,” and holds that no other consent need be sought for. This is a reversal of the well-settled law (21 N. Y. 343; 54 Id. 604). If the consent referred to could be derived from the mortgage instrument itself, then it would be a part of the contract, and irrevocable by the mortgagor, and hence the mortgagee would be absolutely entitled to enter into possession on default without process ; whereas it is settled that- entry without consent is a trespass (Runyon v. Mesereau, 11 John. 534; 21 N. Y. 347; 23 Id. 531 ; 54 Id. 608 ; 4 Kent, 166; 2 Barb. Ch. 135 ; 14 Wend. 236; Trim v. Marsh, 54 N. Y. 604). The view of Justice Sedgwick is drawn, as he states expressly, from the language of Justice Comstock in Kortright v. Cady (21 N. Y. 364), and no other authority is cited for it. But the citation from Justice Comstock’s opinion is not a statement of the present law in this State, but a statement of the comm,on law rights of the mortgagee which have been Abrogated in this State. If the possession be improperly acquired, it cannot be held under a mortgage (4 Hill, 439 ; Doc v. Lord, 7 Ad. & El. 610; Chamberlain v. Choles, 35 N. Y. 477). The entry must be by “consent, or in some lawful mode” (2 Sandf. 328 ; 6 Barb. 76). The possession must be “ lawfully obtained• ” (54 N. Y. 606), which was not the case here, for it was obtained solely under the deed and plan of union, which were unlawful.
*393 An order of reference must be made, to ascertain the amount to be paid by the plaintiff on redeeming the property. On the settlement of the order, any other matters may be presented by the parties in respect of the accounting. Among these, will be as to when balances should be struck for the purpose of the computation of interest.
Memorandum oe Justice Sedgwick on Settling Case.
I did not intend the 37th finding should mean that the plaintiff requested the defendants to hold services according to the Baptist faith, &c., and retain possession of the premises, until the plaintiff should repay the expenses of such services.
The finding should be so modified as to insert the words “for such existing debts and liabilities,” in the place of the words, “ for such purposes.”
Whether or not the sums paid for the services should be allowed the defendant in the accounting for the mesne profits, is another question. Otherwise, I refuse to find as requested by plaintiffs.
I refuse to find as requested by defendants.
*395 III. There was never any consent here that the defendant should enter or hold possession under the mortgages ; the contrary intent is plain. The mortgages were neither of them in default until after this suit was brought ; the plaintiff was seeking possession by suit,; and had no knowledge that defendant held any mortgage.
IV. The 39th finding, to the effect that there was an implied reguest by plaintiff that defendant enter into possession, hold religious services, payoff plaintiff’s existing debts and hold possession until the sums it should pay in discharging the plaintiff’s debts should be repaid, is erroneous. It is plain there was no such express request, and none can be implied. 1. The reason for this finding, it is assumed, was the desire to obtain some ground for an equitable lien for the debts paid. 2. Such a lien must be based either upon a valid contract or a constructive trust growing out of a valid contract, such as equity would enforce, whereas the contract or plan of union here was invalid, as is conceded (Opinion). 3. To give a basis, therefore, for the equitable lien, an implied contract is found by the justice in this 39th finding, independent of the plan of union ; and this we say is erroneous, because : (a). There is a total absence of any evidence of such request. The express contract between the parties— i. <?., the plan of union—excludes any finding of a different and repugnant contract or request, precisely as in Stoddard v. Hart (23 N. Y. 556). The justice in his opinion says: “The law will imply from such facts that the possession was to be a security ” for such payments. But that is the very question, whether the law does imply a lien on the possession when the payments are made upon a different express contract which is invalid and illegal. ' The basis of an equitable lien is an actual and valid contract, or the clear intention of the parties (not a fiction of law contrary *396 to the intention or contract); such a contract as equity would enforce (8 Paige, 439 ; Ewing v. Obaldiston, 2 Myl. & Or. 88). Here the plaintiff did all it agreed to do, or could do. But the thing done was illegal. Hence, it fails wholly. And the court “ cannot make a new contract different from what the writing expresses,” or create a lien which the agreement don’t give. That is the exact point decided in Stoddard v. Hart (23 N. Y. 562). “ The general law of the court is settled by an irresistible strength of authority that it will not lend its aid in any form, or to either party, to carry into execution an illegal contract, or to declare any right or enforce any relief which depends upon or results from it” (Coman v. Sedgwick, 1 Hoff. Ch. 62, and cases cited ; Pratt v. Adams, 7 Paige, 653 ; Wythes v. Lee, 3 Drewry, 396, 406-407 ; Fry Specific Perform. 2d Am. Ed. p. 208, § 308). The moving consideration for all the payments for which an equitable lien is now claimed was a gift of all the property and membership of the plaintiffs to the defendants, and the extinction of the plaintiff’s corporate existence. This was illegal, and a breach of trust, and prevents the enforcement of any part of the contract or plan, or the recognition of any lien, which would be to that extent an enforcement of the illegal contract (Wheaton v. Gates, 18 N. Y. 395, 403; Court of Appeals Opinion in this case, 46 N. Y. 140 ; Weaver v. Whitney, Hopkins Rep. 12; Ottley v. Browne, 1 Ball & B. 360; Ex parte Mather, 3 Ves. 373; Coman v. Sedgwick, Hoff. Ch. 60 ; Jarvis v. Lobdell, Ib. 479 ; Ewing v. O’Baldiston, 2 My. & Cr. 88). The lien, if allowed, would, after ten years, ripen into an absolute title, if not redeemed by tender or suit (Hubbell v. Sibley, 50 N. Y. 468). The cases cited to support the lien are not analogous. They do establish that the plaintiff would be liable to restore the moneys advanced on its account. But they are wholly inapplicable to raise a lien on the land *397 therefor. Morey v. Leake (8 T. R. 411) stood well on the valid covenant in the deed ; the Oneida Bank case (91 N. Y. 490), upon the actual loan of money ; Ryan v. Dox (34 N. Y. 307), upon a constructive trust to restore the subject of the trust; these all support restitution merely ; not restitution and an additional lien as security for restitution. Again, the plaintiff could not mortgage or give a lien on its property without leave of court (12 Barb. 70 ; 18 Ib. 49). It is but an indirect mode of alienation. The judgment in this case, if not paid, will work an absolute transfer of title, by the loss of the power of redemption, as fully as a deed of the land without any sanction of the supreme court. Such a result may come indirectly through a judgment for a lawful debt, but not through a voluntary pledge or alienation of the plaintiff (46 N. Y. 142). If the argument of the opinion is sound, the plaintiff might make any alienation which was not a sale, that being the only thing considered as prohibited by statute ; hence, the decision of the court of appeals ought, according to this opinion, to have sustained the plaintiff’s deed, since they held it not to be a sale. We submit the argument in the opinion is erroneous ; that all alienations are prohibited except a sale with the sanction of the court; that the holding, enjoying, &c., referred to, are for use and retention, not for encumbrance or alienating in any form ; and such, we submit, is the direct decision of the court of appeals. The vivum vadium which the justice here raises by a fictitious implication would be an act by which the plaintiff’s corporation divested itself of all its property for the time being, and for an indefinite period, abnegated all its functions and duties, and deprived itself of all means of growth or resuscitation, and would after ten years had expired, without suit or repayment, absolutely lose its title, since no right to redeem could longer exist (50 N. Y. 468). Is such an *398 act to be deemed within the statute power “ to hold, enjoy, improve, &c. ?” Clearly not; I he powers given are those of retention, use and enjoyment; while alienations, direct or indirect, which subvert the very object of the corporation, are prohibited (Wheaton v. Gates, 18 N. Y. 395. This case in 46 N. Y. 140-3). The vivum vadium process is far worse than a mortgage, since it at once disables the corporation to perform its functions. It is therefore a direct breach of trust of which the taker must have knowdedge, so that its invalidity on that ground would be clear ; just as a judgment confessed for the purpose of selling would be void as a fraud on the law; or a mortgage, upon which possession was at once given by consent. A mortgage fairly executed for the purchase money is good, because, it is part of the acquisition, not alienation of property (18 Barb. 49) ; but every mode of alienation without leave is unlawful (46 N. Y. 142). The act of March 30, 1801, § 28, referred to in the opinion, relates almost exclusively to evidence, proceedings and practice in the courts, and should be construed with reference only to the subject treated of in the act. Besides, the mere repeal of English statutes would not change “our common law,” although derived from those statutes. And such is the decision of the court of appeals. (2). The defendant having, therefore, neither an equitable lien for the floating debts paid, nor the right to hold as mortgagees in possession, the plaintiff was entitled to judgment of ejectment, as requested, and as decided by Justice McCunn on the first trial (19 Abb. 105).
Y. There are no errors to defendant's prejudice in the principles of the accounting as ordered by the justice. (1.) The true rule applicable to the defendants as mortgagees in possession, as we claimed on the trial, and still believe, is that they be charged with the fair cash rental value during their occupancy ; the rule is *399 the same as for mesne profits in ejectment. If the defendant does not occupy in person, he is chargeable witli his actual net receipts from rents, or what by reasonable diligence he might have received ; if in personal occupation, with a fair cash rent, or the reasonable value of the use (4 Kent, *166: Bell v. The Mayor, 10 Paige, 73 ; Calkins v. Calkins, 3 Barb. 313; 20 N. Y. 154). In Van Beuren v. Olmsted (5 Paige, 12), the Master was directed to charge “a fair cash rent.” In Holmes v. Davis (19 N. Y. 495), defendant "was held chargeable “ with the fair value of the use and occupation.” To the same effect are Vandervoort v. Gould (36 N. Y. 639, 646); Ruckman v. Astor (9 Paige, 520); Vroom v. Detmas (4 Id. 434); Gordon v. Lewis (1 Sumner, 143); Quinn v. Britain (Hoff. Ch. 358); Jackson v. Wood (24 Wend. 443); Low v. Purdy (2 Lans. 426); Worrall v. Mann (38 N. Y. 144; 53 Id. 136). (2.) The fact that the “use and possession were of a kind consented to by the plaintiff ” cannot change the rule. In the cases above cited, or in any case, is it to be supposed that the use and possession by the mortgagee in possession were of a different kind from what was consented to \ Does the kind of use to which a tenant puts the property affect his obligation to pay rent, or the legal rule of its fair value % or does the consent or dissent to the particular kind of use affect the owner’s measure of recovery % (3.) It was apparent on the trial, from the proved value of the property, that a fair rent for the property would be higher than the probable receipts from pew rents. And the rule adopted by the justice was one of concession to the defendant—an abatement from the strict rule in equity, after the analogy of property rented out. (4.) The difficulty of allowing any such concession is seen from the fact that during the whole period, with the exception of the first nine months, the plaintiff has been claiming its rights by suit, and has been kept out of *400 them by the defendant. In July, 1863, the plaintiff commenced suit; soon after it offered settlement of all claims for its debts paid by defendant, which the defendant refused and insisted, not on a lien for security, but on title in fee, under the deed. During this long period, while the defendant has been resisting a just demand, it seems to us difficult to justify legally any abatement of the rule to charge “a fair cash rent.” The same considerations would exclude all payment on account of plaintiff’s debts during the litigation. The rule is well settled that a defendant’s dealings with the subject matter of the suit, pendente lite, are at Ms own rislc, and shall worTc no injury or embarrassment to the plaintiff (Jeffries v. Cochrane, 48 N. Y. 671 ; Murray v. Ballou, 1 J. Ch. 576-9 ; Layfield v. Layfield, 7 Sims, 172; l Paige, 157; 9 Id. 469 ; 3 Abb. 298 ; Story Eq., § 1016, b; 1 Hoff. Ch. 357; Winchester v. Paine, 11 Ves. 194).
YI. Ohurch Services.—The claim of the defendant to introduce the cost of maintaining religious services as an offset to the charge of pew rentals is unfounded. This claim was very fully argued at the trial, and on settlement of the order of reference, and rejected. (1.) It loses sight entirely of the fact that the basis adopted of charging defendant for net receipts from pew rentals was itself but a concession to the defendant, an abatement from the ordinary and true rule of charging the fair cash rental value of the property. (2.) It loses sight also of the single question involved, viz.: What is the proper rule for the charge against the defendant, as mortgagee in possession, for its use and occupation of plaintiff’s premises during thirteen years? We claim that centuries of equity practice have established the simple rule of “a fair cash rent,” as fully as the law has fixed the fair market value as the measure of recovery for goods sold at no stated price. The renting of churches was not unusual ; “four other Baptist *401 churches rented places of worship.” (3.) The case of seats purchased in a theatre, &c., entitling the holder to witness a performance, &c., has no application or analogy; for in these, and in all similar cases, the ticket represents both the price of admission and the seat. The admission is not free. But the church services were free to all. All persons were invited to come, and to occupy any seats not rented. The gallery pews were never rented and were always free; so with the whole chapel building. The pews rented formed in fact but about one third part of the building which the defendants occupied and used for its corporate purposes. The pew rent was paid by the occupant for the use of a certain and fixed seat, instead of having an uncertain and changing seat gratis. There was no distinct payment for any particular services ; the pew rents received, and all other collections went into the defendant’s general fund, which maintained much other than the Sunday services ; and what was needed to balance the account from year to year was raised by contributions or subscription. The defendant rented out about one-third of the church in seats for Sunday services, used and enjoyed all the rest of the property on Sundays, and the whole property at all other times, as it had occasion ; and it should therefore pay what it actually collected through the,use of the building, or else the fair rental value of the whole property. (4.) The defendant’s claim would make the defendants the mere agents or partners of the plaintiff in carrying on religious services, by throwing all the cost of it against the fair charge for use of plaintiff’s property, and while the defendants are claiming a repugnant position as mortgagees in possession. Such a copartnership is neither legal nor within the remotest intention of the parties, (o.) It would necessarily result in paying the plaintiff nothing for the use of its property during this long period ; for the defendants raised only *402 what money they required, without providing anything for the rent accruing to the plaintiff. (6.) The attempt to charge the cost of the-services as an offset to pew rents would be impossible, because all the payments proved for the items claimed under this head were payments in gross for services or charges involving much more than the mere Sunday services; for the Sunday-school, two weekly meetings, pastor’s and sexton’s duties, music, gas and fuel, a very considerable part of the charges paid were wholly independent of the Sunday services, and are incapable of division or apportionment.' (7.) That some of the plaintiff’s members have enjoyed the benefit of the defendant’s church sernicss is wholly immaterial. As the court of appeals declared, that is no benefit to the plaintiff' s corporation. On the contrary, it is a great injury to the plaintiff’s corporation, for it has deprived it by so much of the means of self-support.
VII. The principle invoked by the defendant, viz.: “ indemnity” to the parties, is the basis of the rule charging the fair cash rental value. 1. The “indemnity” required must be for the loss sustained by being deprived of possession for some thirteen years; this loss is, in legal consideration, not speculative, consequential or accidental results, which equity rejects as much as the law (Warrall v. Munn, 38 N. Y. 144 ; 53 Id. 188), but the value of the use of which the plaintiff has been deprived. The defendant, who has enjoyed the possession, is estopped from saying the plaintiff would have derived no benefit from it. That is not its concern. The plaintiff had the option either to occupy its own building in its own way, and, if so, presumably deriving a benefit therefrom equal to its rental value; or else to rent it out at its fair value and occupy elsewhere. Thus the rental value is the real and proper legal and equitable “indemnity.” (2.) It is the same in respect to the rise in valúe of the property. It *403 might have fallen, and it has fallen since 1872. In either case, such fluctuations are not a subject of legal consideration, except as affecting the value of the use. This was expressly ruled in the court of appeals, on the further hearing of the same case of Worrall v. Munn (53 N. Y. 188-9). (3.) The suggestion of the defendant that the plaintiff would have used the premises for the same purposes of worship, and have derived no pecuniary benefit from the use, and have been just where it would be now, on a surrender of the property without an allowance for rent, is neither true nor pertinent. It is answer enough to say, that the plaintiff, as a corporation, has been kept out of possession for thirteen years ; and that, had it chosen thus to stay out voluntarily, it could ham rented the premises for the full rental which the referee has found; and so could the defendant have done as mortgagee in possession, had it chosen to do so, instead of occupying the premises itself. (4.) The whole plan of union having utterly failed from its inherent illegality, it is impossible to attempt to execute it in part, or to derive from it any rule of compensation to either party, as though it were valid. The court cannot execute it, in whole or in part, either directly or indirectly, by adopting it into the rule of compensation (18 N. Y. 403; 1 Hoff. Ch. 62); nor does the defendant propose to do so, in so far as affects itself; for it has claimed and received the full value of the use of its own property, by way of interest on the debts paid or bought with it, contrary to the idea of the plan of union. (5.) Nor has the court a right to invent a contract which the parties never intended, substitute that for the plan of union, and then base a judgment upon such a supposititious agreement (23 N. Y. 562). (6.) The fact that during the whole period except a few months prior to July, 1883, the defendant has had full notice of the plaintiff’s claims, debars the defendant from any favor. The de *404 fendant is in the same position as the defendant in Worrall v. Munn (See Cases, Point VII.). (5). Its claims pendent lite are only such as it has strictissimi juris.
VIII. Repairs.—Such items only as cleaidy belonged to the personalty or to the services held there, and were not necessary changes, or real improvements on the property, were disallowed. The rule is well established that a mortgagee in possession cannot burden the equity of redemption by any charges not necessary to the preservation of the property (Story's Eq. § 1016, b. ; 1 Hoff. Ch. 357; 1 John. Ch. 385). The only exception is in favor of persons supposing themselves to be owners, who, in good faith and without notice of adverse claims, make real improvements ; then, especially if the real owner has been guilty of laches in asserting his rights, they may be charged to the latter (Mickles v. Dillaye, 17 N. Y. 80), But this exception would apply in this case only to improvements prior to July 80, 1863, when this suit was brought, and none -such are disallowed. Since that date, the parties have .understood each other’s claims, and have stood on their legal rights ; and the rule excluding unnecessary expenditures applies strictissimi juris (Vroom v. Ditmas, 4 Paige, 534, 62 ; Murray v. Ballou, 1 Johns. Ch., 576-9).
IX. Insurance.—The same principles, with mod- . ifications, apply to claims for premiums paid for . insurance. The referee has allowed all insurance paid down to the commencement of suit in July, 1863. After that date, on the same ground of full notice of plaintiff’s claims, the defendant, in order to recover premiums of insurance paid, must show their right to them strictissimi juris. ISTow, the rules of law in respect to insurance, as between mortgagor and mortgagee, are perfectly settled by almost numberless decisions. Each has an insurable interest in the property ; *405 each may insure for his own benefit; and neither can, in any form, claim any benefit from the policy taken out by the other, except by contract between them. If the mortgagee insure in his own name Ms oion interest only, and not for the mortgagor, the latter derives no benefit from the policy in case of loss, but the insurance company, on payment of the policy, is entitled, in whole or in part, as the case may be, to an assignment of the mortgage, which it can thenceforth hold and enforce without abatement against the mortgagor (Grovenor v. Atlantic Ins. Co., 17 N. Y. 391, 441; Savage v. Howard, 52 Id. 507-8; Cone v. Niagara, &c., 60 Id. 624 ; Excelsior v. Royal, &c., 55 Id. 359 ; Kenochan v. N. Y. Bowery Ins. Co., 5 Duer, 5). Conversely, a mortgagee cannot claim the benefit of the mortgagor’s receipts on his owm policy upon the mortgaged property, in the absence of any express contract respecting it (10 Peters, 507 ; 8 Paige, 437). All this follows from the simple principle that insurance is a personal contract, for the personal indemnity of the assured, and of him only. A mortgagee, though he may insure on his own account, has no authority to insure upon the account, or for the benefit of the mortgagor, either before or after entry, except under the express provisions of the mortgage, and can make no charge therefor; hence the reason for the general insertion of the insurance clause in the mortgages on improved property (Fause v. Winans, Hopk. 283; Quinn v. Brittain, Hoff. Ch. 357; Dobson v. Land, 8 Hare, 216 ; Sauders v. Frost, 5 Pick. 260 ; White v. Brown, 2 Cush. 412). In case of loss, the company might have refused to pay on the defendant’s policy on the ground of a false statement of ownership, and its consequent invalidity ; and if they did pay, they could have demanded an assignment of the bond and mortgage pro tanto: In either case, no claim for premium could exist against the *406 plaintiff (Cases above cited, Scott v. Guernsey, 60 Barb. 180).
X. Should there be any inconsiderable items which the court think should be corrected, the changes can be made by the parties without a new trial, or sending the case again to the referee. But if any essential change should be ordered in the principles of the account, the plaintiff claims a new trial on the grounds stated in Points I to IY. The interests of both parties alike demand a speedy termination of this long litigation, almost equally destructive to both. If any legal errors have been committed, they are in the defendants interest, and so far as respects the defendant’s claims, the judgment should be affirmed.
Wm. R. Martin, attorney, and of counsel for defendant, submitted points in support of the proposition that defendant has an absolute title in fee, and then proceeded :
Lien and possession.—It is the well settled rule that a mortgagee in possession, by consent after default, can hold possession until the property is redeemed by the payment of the amount due the mortgagee. Here the consent is distinctly found and fully supported by the evidence. The defendants were in by consent, and while so in possession, without any tortious act, became assignees of the mortgages. For the debts paid, other than these mortgages, the defendant has an equitable lien to hold the property until these also were paid. This they are entitled to in equity, because: 1st. They were, some of them, charges and liens upon the land. And, 2d. They were payments by the vendees of the purchase money. The payment of the purchase money in this form, having been made while in possession, at the plaintiff’s request, the defendants have a lien therefor, where the deed turned out to be ineffectual to pass the title. The *407 legal principles on which these positions rest are so clearly set forth in the opinion of Judge Sedo wick at special term, that they need not be recapitulated. See also as to purchaser’s lien (Gibert v. Peteler, 38 N. Y. 165; Rose v. Watson, 10 H. L. C. 672; Torrance v. Bolton, 14 L. R. Eq. Ca. 124). The legal title to the mortgaged premises remains in the mortgagor (Trimm v. Marsh, 54 N. Y. 599). The defendants’ objections to this account are as follows: 1st. That the referee should have allowed certain items for repairs that he has disallowed. 2d. That he should have allowed certain items for premiums of insurance which he has disallowed. 3d. That he should have allowed the expenses of conducting public worship in the church in which the pew rents were paid.
The Repairs.—The following items were improperly rejected:
1863. Dec. 24. James Clark, baize doors.. $110 00
1866. Jan. 11. Willmore & Jones, shades. 65 00
1870. March 28. Architectural Iron Works, railing.................. 50 00
1870. July 19. James Clark, partition, &c., 325 00
Facts stated.
1870. July 10. Geo. H. Kitchen.......... 14 07
“ “ Meyer & Hagen.......... 20 00
“ " Sloan.................... 41 20
“ “ Kelly................... 26 11
1871. March 2. Jones, re-covering doors.. 51 93
These items of repairs should be allowed to the defendants, because all improvements that are permanent or beneficial in their nature should be allowed (Sedgwick Dam. 140, * 128, note; 2 Story Eq. Jur. § 1016, c. ; Mickles v. Dillaye, 17 N. Y. 80; Bedell v. Shaw, 49 Id. 46). They were made while the defendants were in as owners under the judgment of the court. They *408 were permanent in their nature and belonged to the building, and replaced or renewed articles of necessity for public worship.
Insurance.—The defendants claim that they should be allowed the premiums on all the insurance which they kept upon the buildings, upon the following grounds : This is not the case of a contract between parties in which insurance is provided for, or where the parties had no right which they did not include in the contract. The defendants do not rest therefore on their position as mortgagees, nor does it matter that insurance is a personal contract. The defendants believed themselves to be owners under a valid contract and with an absolute title as purchasers, confirmed by the courts, and they actually paid out premiums of insurance, which were fair and reasonable. They afterwards, by the judgment of the court, stand in a new relation to the property, as mortgagees in possession and equitable lienors. The terms of this new relation are implied from the facts of the case, according to equitable principles, and these payments for insurance should be reimbursed. If the property had been burned and the insurance money stood in its place, either in the hands of this defendant or the court, the defendants would be called on to account for it, and the court would give the plaintiffs the benefit of it. They should, therefore, repay the premiums paid out in a prudential regard for the rights of both parties in a peculiar case. This rule would rest on the peculiar facts of the case, for the terms of the settlement must be such as are just and fair. The defendants supposed themselves to be owners with an absolute title, and this fact controls the principles of the accounting.
jExpenses of Public Worship.—3d. The expenses of conducting public worship. These are embraced in four *409 classes: 1. Salary of the minister. 3. Salary of the sexton. 3. The expenses for music. 4. The expenses for gas and fuel. The defendants claim that these expenses of conducting public worship were essential ; that they were the consideration for which the pew rents were paid, and that they should be deducted or set off against the pew rentals, in estimating the fair rental value, or value of the use and occupation of the church. According to the referee’s result, the account between the parties stands in this way. At the outset—The plaintiffs had a church property which they could not hold from their creditors ; it cost them one hundred and twenty-two thousand dollars, was encumbered with debts for seventy-three thousand dollars, and the surplus of value in the depression of the war times was lost to them. The defendants had valuable property in Oliver street, Amity street, and. elsewhere, which in the depressed times they sold for enough to pay the seventy-three thousand dollars of plaintiffs’ debts, and paid them. Now, the referee brings the plaintiffs out with their property preserved to them free from incumbrance, and worth, according to their proof, from two hundred and twenty-five to two hundred and fifty thousand dollars, and he gives the defendants back the money they advanced, and the interest, but takes it all away by charging them for the use of the property an equal sum ; that is, the plaintiffs have the whole and the defendants nothing. This is inequitable and unjust; the parties should go out as they went in; the plaintiffs with their property preserved and doubled in value, and the defendants with their money increased by the interest. This would be a just restoration and restitution. If the union had never been formed, the plaintiffs would have held their property, and paid their debt with interest; the defendants would have had their money increased by its interest. As *410 to the use of the property, each of the parties would have held and used it as a church, and applied the income from pew rents to the expenses of maintaining public worship ; and neither would have made any money out of the use of the building. The defendants were restricted to that use of it.
The rule of damages.—The plaintiffs have at various times claimed—1. Damages for withholding possession. 2. The value of the use and occupation. 8. The pew rents, as and for mesne profits. The third view was sustained by the court at special term. It is clear that the allowances are not to be made in either of these views. 1. Damages for withholding possession are not demanded in the complaint, nor directed in the decision or orders (Larned v. Hudson, 57 N. Y. 151). 2d. The value of use and occupation cannot be recovered, except where the relation of landlord and tenant has existed. It cannot where the occupant came in under an agreement to purchase (Thompson v. Bowen, 60 Barb. 478-9). 3d. Mesne profits cannot be recovered except in case of trespass, or of a tortious holding. They cannot when the possession was taken by consent (Thompson v. Bowen, supra; 3 Phil. on Evid., 4th Am. ed. 623; Sedgwick on Damages, 135 (* 126); Adams on Ejectment, * 391). The plaintiffs’ confusion as to the rule under which the allowances are to be made results in this, that neither are strictly and technically applicable. The case is to be considered as an equitable one, on its own special facts.
The Equitable Rule.—The ancient rule that ejectment would not lie for a church or a chapel (Tyler on Eject., 42; Adams on Eject., 21), because they were res sacros, and therefore not demisable, though no longer followed, remains as the foundation of the equitable principle which distinguishes churches from other real property, in this respect, that they are not made the source of pecuni *411 ary profit. The defendants by their agreement were restricted to the use of this property for religious purposes, and they so held it. They did not make any pecuniary profit; they maintained their religious services at a greater expense than their total income, and this was the rule of the order to which both the parties belonged. The plaintiffs would not have used it for any other purpose, nor for pecuniary profit. This must be kept in view as the cardinal fact in determining the damages. The damages are not to be ascertained under any technical rule, but on the equitable principles which the court apply to a case of peculiarly equitable features, where the court establish the relations on which the parties held this property for many years back, and determine the details of their contract. The general principle in such cases is indemnity or restitution. Each party is to be restored to the place and position in which it would have been, if the void deed had not been made, which prudent men would have provided in entering upon just such a contract as the law has made for them. Each at the time understood their agreement in the sense in which they went on to perform it. The point on which it was subverted was purely a technical one, which they did not anticipate. This principle of indemnify as the equitable rule is supported and abundantly illustrated in many cases (Gibert v. Peteler, 38 N. Y. 165 ; Worrall v. Munn, 38 Id. 137 : S. C., 53 Id. 185; Mickles v. Dillaye, 17 Id. 80 ; Benedict v. Gilman, 4 Paige, 58 ; Bell v. Mayor, &c., 10 Id. 49 ; Wetmore v. Roberts, 10 How. R. 51 ; Holmes v. Davis, 19 N. Y. 493; Murray v. Gouverneur, 2 John. Ca. 441; Story Eq. Jur., sec. 1,016 a, and notes; Sedgwick Dam., p. 126). If these parties had placed themselves in the position they now occupy, by a contract, its provisions would have been that the plaintiffs, being embarrassed for want of money to pay their debts, and *412 having a church property imperilled by these debts, agreed with the defendants that they should take up, pay and bold these debts for a period of years, or until the plaintiffs were ready to redeem, and then to allow them to do so with interest. In such a case, on the redemption, the plaintiffs would get back their property, doubled in value, and the defendants their money, and the interest it had lawfully earned. In respect to the occupation, their agreement would have been, that public worship should be maintained as it had been before, and as was customary with these two churches, and the denomination to which they belonged, to which each party should have access ; that the pew rents should be applied to the payment of the repairs and insurance, and to the maintenance of public worship, and that the surplus should be applied to the reduction of the interest. It is unquestionable that each one of these parties must have done precisely this, if they had remained in sole possession. As it has turned out, if this rule is applied, the revenue has about equalled the expenses, without reducing the interest, and the plaintiffs regain, with their possession, the natural increase of attendants and contributors, to use the expression, the good will, which is valuable to them as a source of revenue. The plaintiffs have not been at expense in maintaining any other place of worship, but have made use of the common facilities. They regain their property, increased in value, with a settled congregation. The defendants have to go away, to break up an arrangement which they thought permanent, and to bear the expense and trouble of establishing a new church enterprise, and gathering a new congregation. This solution of the accounts and damages would be an equitable and just restitution. All the equitable circumstances of the way in .which this union was formed, the defendants were brought, by mutual mistake, or through misun *413 derstanding of the law, into a position they neither intended nor anticipated, but in which it is found that they have acted in good faith, shows its justice. The conclusion of the referee, which gives the plaintiffs all and the defendants nothing, wholly contradicts and violates every equitable rule, and every point of a fair restitution. The pew rents were not derived as rentals for the naked use of so much space on the floor of the church, but for the services of public worship. In order to entitle themselves to receive the pew rents, a church is bound to supply public religious services, and to be at the expense of maintaining them. This public service was the condition or consideration on which the pew rents were received. The rents were not, therefore, the measure of the annual value of the property, but the expenses must be first deducted. There are several cases where these special circumstances have called for the application of equitable principles to this question of the allowance for the use of the property. Worrall v. Munn was the case of a clay pit, where the profit was in taking the clay from the soil, and thus consuming the capital/ Holmes n. Davis was the case of a mill where the expenses were deducted from the earnings. Davis v. Talcott (14 Barb. 622), was a like case. Averett v. Brady (20 Georgia, 523), was the case of a ferry. The mesne profits were held to be the proceeds of the ferry, deducting the expenses of fitting it up, and carrying it on. The fact in this case, that the defendants believed themselves at the outset to have a good title as owners, were for a long period sustained as such by the courts, and still contend for that result, has a general bearing upon the question ; a more liberal and a less technical rule is applied to them. This doctrine is found in Story Eq. Jur. (sec. 1,016, and note, 11th edition, pages 235, 236, and cases cited ; Parkinson v. Hanbury, L. R., 1 Ho. Lords, 1). The same fact is *414 made the ground for a more liberal allowance for repairs and improvements (in Harper’s Appeal, 64 Penn. St. 315 ; Troost v. Davis, 31 Ind. 34; McSorley v. Larissa, 100 Mass. 270 ; Bacon v. Cottrell, 13 Minn. 194 ; Roberts v. Fleming, 53 Ill. 196).
Limitation.—The recovery for mesne profits should be limited to six years (2 R. S., p. 311, sec. 4; Jackson v. Wood, 24 Wend. 444; Sedgwick Dam., 4th ed. p. 140, *128; Budd v. Walker, 9 Barb. 493 ; Morgan v. Varick, 8 Wend. 507; Wells v. Yates, 44 N. Y. 535). Tiie six years is the period previous to the suggestion of the claim, which in this case is to be taken as the first order of reference.
Costs.—The costs are in the discretion of the court, as an equitable action. On the primary question of title, success by the defendants would be complete success in the action, and entitle defendants to costs. Success by the plaintiffs would only entitle plaintiffs to redeem, and that would give costs to the defendants. The party who redeems pays costs (3 Wait's Pr. 147).
1. The defendants should have judgment for a good title by the deed. 2. If this judgment is not given, then the judgment at special term should be' affirmed, except in its adoption and confirmation of the account stated by the referee. 3. The defendants should be allowed for the expenses of public worship in the property, and for the rejected items of repairs and insurance, and the account re-stated accordingly. 4. Costs should be given to the defendants.
By the Court.—Curtis, Ch. J.
Religions corporations, of their own free act and will, have not the power of executing a conveyance of their real estate. Presumed to hold this class of property not for worldly gain, but to promote the highest welfare of the public and for pious uses, its alienation by those who *415 thus hold and administer it in the nature of a trust is subject, to various restrictions. Our legislation seeks to restrain it from b°ing inconsiderately, injudiciously or improperly conveyed. To effect a valid sale it requires that it, shall be authorized by an order of the supreme, court, made upon a petition, stating certain facts to give that court jurisdiction.
In the present case no question is presented in reference to the judiciousness and propriety of the sale. It is impossible to read the voluminous record and proofs that came before us, without being impressed with the sincerity and the conscientious and devout motive, that in a time of pecuniary distress and of public peril and calamity, led to an arrangement, which according to all human foresight would not only preserve the property of the parties from sacrifice, but consolidate it for more efficient and beneficent usefulness.
But the question of the validity of that sale has been passed upon by the court of final jurisdiction (46 N. Y. 131) which has held that the petition of the plaintiff was insufficient to confer jurisdiction on the supreme court to make the order of sale, and that the deed made in accordance therewith is void. There is nothing disclosed on the new trial that brings this question of the validity of the sale before us. The facts shown, and the same petition, fail to make out a different case on this question than that which has been already considered and determined by the court of last resort. This question thus already adjudged is not before us.
The defendant, in view of the contingency that the deed to it may be declared void, sets, up by answer, that in 1863, it became by assignment, the owner of two mortgages, one for twelve thousand five hundred dollars and the other of thirty thousand dollars, on the premises, executed by the plaintiff, which have not been paid at maturity, and under which it claims to *416 hold possession. The defendant also alleges the payment of other debts owing by the plaintiff, and also the payment of large sumsin maintaining the premises and public worship therein, for which it asks reimbursement. The defendant prays for judgment oí foreclosure in case it is held, that it is not entitled to the possession of the premises, under any right other than as a.mortgagee in possession.
The proofs establish that the defendant is in possession under these mortgages and with the mortgagor’s consent. The plaintiff, in its supplemental complaint claims, that in case it shall be held, that the plaintiff is entitled to a judgment of foreclosure, that an account should be taken of the rents and profits ol the premises received by the defendant, or with which, it is properly chargeable, and that the same be deducted from any amount that may be found due to .the defendant upon the mortgages and other claims made by the defendant.
The plaintiff's action, in view of the deed having been adjudged void, resolves itself into one to redeem the land from the mortgages, and from such other debts as were charges upon the land, and which courts of equity require to be paid in actions to redeem.
Upon the pleadings and the facts appearing at the new trial, the learned judge at the special term, properly made the orders of reference, and correctly indicated to the referee, the nature and mode of the accounting, to be taken before him. They are framed to give effect to the conclusion arrived at, that the plaintiff had an equitable right to redeem the land from the mortgages, but only upon the payment, in addition, of such debts of the plaintiff as were paid by" defendant, and the reimbursement of such expenditures as were charges upon, or incurred in the maintenance of, the realty, charging the defendant with such rents as it received from the occupancy of the premises.
*417 The actual receipts of the defendant from the rents of pews during this occupancy, less the cost of collecting them, amounts to one hundred and six thousand seven hundred dollars and ninety-one cents, as appears by the referee’s report, while it also further appears by the report, that the fair rental value of the use and occupation of the premises during the occupancy was one hundred and fifty-four thousand and four hundred dollars.
The court at special term held, that under the circumstances shown, and in view that the defendant’s occupancy was of a kind consented to by the plaintiff, that the defendant should be charged with, mesne profits only upon the basis of the actual revenue received by it from the church property, down to the time of the accounting.
The defendant claims that upon the accounting, taken pursuant to the orders of reference, items for repairs and renovations paid by it, amounting in all to seven hundred and three dollars and thirty-one cents, were improperly rejected, and that they should have been allowed because they were permanent in their nature and belonged to the building, and replaced or renewed articles of, necessity for public worship. These items disallowed appear to be for temporary baize doors to exclude cold in winter, the recovering of them with baize when worn out, window-shades to keep out the suu, trimming and modernizing the pulpit in the lecture room, making it look better, and more pleasant for the pastor to occupy, and getting a new reading desk for the Sunday school superintendent, and making more convenient partitions for the Sunday school room, and providing an iron railing, at an expense of fifty dollars, to the stairway leading to it from another room. None of these items are shown to be beneficial to the building, or of necessity for public worship, or to be even permanent, except the iron *418 railing. They doubtless added to the comfort of the defendant in its occupancy of the building, and the railing may have been necessary in the mode in which it made use of two of the rooms, but it does not appear that these expenditures were for any such substantial benefit to the realty, that the plaintiff should be charged with them in the accounting.
The defendant also objects that certain of the premiums paid by it for insurance of the premises were disallowed. The referee allows all the premiums paid by defendant down to the commencement of the suit, and after that date, when the defendant had notice of the plaintiffs’ claims, the referee allows the premiums of insurance for each year to the extent of the insurance provided for by the mortgage, and disallows the others, amounting to four hundred and twenty-two dollars and fifty-nine cents, paid by defendant.
If the defendant, after full notice of the plaintiffs’ claim, and being in possession under the mortgages, sees fit to insure the premises for his own benefit for a greater amount than the contract in the mortgage authorizes him to do, it is difficult to see how this .creates any claim against the mortgagor. It is the right of the mortgagor, in the absence of any contract in respect to it, to exercise his own judgment as to whether he will or will not insure his interest in the mortgaged premises. But where a contract is made, as in the present case, defining the rights and duties of the parties as to the nature and extent of the insurance that should enure to t.he defendant’s benefit, no reason exists why the mortgagor should be made liable for premiums paid by the defendant for any unauthorized additional insurance. The agreement by which the parties to the mortgage respectively protect their rights as to liability for insurance, is not thus lightly to be varied. The plaintiff may or may not have insured its interest in these premises, and what *419 ever action it took, it in no way affects tlie defendant. The latter’s right to insure and claim for the premiums paid after the plaintiff commenced his action, is controlled by the provision of the mortgage, and if the defendant deemed it desirable to have further insurance than that provided, it was its right to effect it, but only at its own expense, since it was solely for its own advantage. No legal or equitable claim was thereby created against the plaintiff.
The "defendant further claims that it should have been allowed upon the accounting for the amounts paid out for conducting public worship, as follows, viz. :
For Salary of Minister........... $59,995.99
For Salary of Sexton........____ 8,693.92
For Expenses of Music.......____ 28,463.34
For Expenses of Gras and Fuel.... 6,017.56
Making a total of................$103,170.81
and that this amount should be deducted from the one hundred and six thousand seven hundred and ninety-one dollars received from the rents of the pews. This claim is based upon the statement that these expenses of conducting public worship were necessary, and formed the consideration for which the pew-rents were paid, and should be deducted from the pew rentals in determining the fair rental value, or value of the use and occupation of the church.
It appears that since October 21, 1862, the income of the defendant has. been derived from pew rents, contributions, donations, subscriptions and use of the church edifice. With an income received from all these sources, no just or equitable reason appears that this large total of the expenses of conducting worship should be charged against and deducted solely from the item of pew rents. From anything shown,- it is *420 equally chargeable to, and equally defrayed from the other sources of income ; and when the plaintiffs’ right is considered, it is equitable that they should be defrayed from those other sources, without prejudice to the plaintiffs’ right to compensation for the use of property adjudged to belong to it, and for which it was, during most of this time, strenuously contending.
But passing from the consideration of this to the position taken by the defendant, that these expenses of conducting public worship were necessary and formed the consideration for which the pew-rents were paid, and still there are difficulties in the way of sirstaining it. The law as administered in this country, knows no standard of what may be necessary in conducting public worship. That the element of a pecuniary consideration should enter into the conducting of it, may offend the conscience of some, and even music be regarded as a vain ceremony, while others may consider that expenditures for religious instruction, services and music, are acts in the appreciative discharge of very high duties. The law does not indicate what is necessary for conducting public worship, and the case equally fails to throw any light upon it.
Neither does it appear that these expenses formed the consideration for which the pew-rents were paid. It may have been that the lessees of the pews paid their rents in order to listen to the minister, and to the music, with the adjuncts of light and warmth and the services of the sexton, and it may have been, that they paid their pew-rents for the privilege of assembling for the performance of religious offices and services, the celebration of the sacraments, offering of prayers, promoting spiritual improvement, and to entitle themselves and their families to the advantages of the Sunday school, the lecture-room and pastoral *421 visitations. However this may be, the proofs are silent, and the law can make no presumptions, as to the motives that swayed human minds in transactions of this nature.
To make a division or apportionment of the charges for Sunday services is impossible. The inquiry can extend only to what the defendant received by reason of its occupancy of the plaintiffs’ property. It cannot take into consideration how the defendants’ tenants saw fit to enjoy such portions of the realty as were leased to them, or what expenses were incurred in such enjoyment, or what considerations induced them to enter into the leases. The proper limit and rule was adopted and pursued upon the accounting, and sustained at the Special Term at the hearing of the defendants’ exceptions to the referee’s report.
The judgment and the orders appealed from, should be affirmed without costs to either party as against the other.
Van Vorst, J., concurred.